22-3076, and we will start with Mr. Laverghetta, if I'm pronouncing that correctly. And just to clarify, because I don't see you on the brief per se, are you a student or are you with us? I'm sorry, I was supposed to be arguing with, hit by a medical condition. Very good. A very useful partner. Well, good morning, Your Honor. I appreciate the compliment. May it please the Court, Dean Laverghetta, for Mr. Nunez, the appellant, I'd like to request five minutes of your time for my rebuttal. Granted. Through our LUPA, Congress has mandated that burdens on inmates' religious exercise be subject to strict scrutiny. Congress has forbidden the government from imposing substantial burdens on religious activity unless it demonstrates with evidence that the burden imposed on that specific person in that specific circumstance furthers a compelling governmental interest and is the least restrictive means of furthering that interest. Here, however, the DOC and the District Court below fail to properly apply that demanding standard. In relation to Mr. Nunez's request to, one, engage in congregate prayer, two, receive a religious circumcision, and three, consummate his marriage. Can we start with the congregate prayer? Because I take the positions of the parties that, notwithstanding the transfer to SCI Illinois, that when it comes to the policies for conjugal visits, circumcision, that that would apply across the board. But at least as proffered to us, although not in the record per se, it appears that there are some different conditions, such as the availability of virtual communal prayer at Mahanoy. How should we factor that in? Is the claim moot as to Huntington? And how do we account for what we've been told that's not currently part of the record? Thank you, Your Honor. So first, if I could begin, that statement was made in a letter we had submitted in relation to a question of mootness as a result of a question from this court. The state admitted on the circumcision claim and on the conjugal visit claim that there was no mootness. They also, if you read the letter carefully, did not say that the case was moot because of the allowance of virtual prayer. What they did is use it as an opportunity to try to submit a least restrictive means analysis or option that they never submitted as part of the case. I think it's too late. It's clear that they didn't consider the virtual prayer as an actual alternative means. Otherwise, they would have brought it up. Second point on this is that virtual prayer is not what Mr. Nunez is asking for. The Supreme Court is clear that it doesn't matter if somebody is allowed to engage in some other form of religious exercise. The question is, is there exercise here being burdened? I appreciate that. As we've all lived through COVID, I think we all have an appreciation for the differences between a Zoom interaction and in-person interaction. But if we're to consider here what's been offered, either in terms of whether it constitutes a substantial burden or least restrictive means, and the current facility has some different conditions, how can we talk about that in this appeal? I mean, I respectfully submit that the fact that they are offering virtual prayer is not relevant here. Religion, there's a corporal component to religion, which is recognized throughout different religions. Here, what he requires is congregate prayer. That's specifically what he asked for, not some other form of prayer. Let me ask you a question. Did the DOC ever point to a system-wide policy to explain why it denied this accommodation? Excuse me? Did the DOC ever point to a system-wide policy to explain why it denied this accommodation? So, for example, it's clear with respect to the circumcision and the conjugal visits that there is a policy that applies across all prisons no matter what. I'm wondering if there's anything like that with respect to congregate prayer.  In the case at hand, the only interests that the state has advanced are generalized interests related to security and contraband, nothing specific to Mr. Munoz, and there's been no mention in this entire case of this virtual prayer option. So, of course, there's been no sort of analysis as to whether that is actually the least restrictive means. The Supreme Court has been very clear on this. The state bears the burden of proving both one that is a compelling interest specific to this individual by offering evidence, and then the least restrictive means prong has to show that it considered and rejected all reasonable alternative means. Again, the record is barren on this, and the only alternative means that they submitted on congregate prayer was in the letter brief, which, again, is a different form of exercise, not what Mr. Munoz requested. Does the availability of virtual congregate prayer go to the substantiality of the burden? I'm sorry, repeat that, Your Honor. Does the availability of virtual congregate prayer go to the substantiality of the burden? I don't believe so, Your Honor. The state of rationale for banning congregate prayer here was largely based upon the idea of contraband. The record is clear, and there's no dispute that Mr. Munoz has never violated any sort of prison rule related to contraband. I'm asking a slightly different question, which really goes to the prime facie case, and that is if what's needed is, in part, to be engaged in prayer simultaneously with the ability to see and exchange views and auditory prayer with others, many of those things are provided through virtual congregate prayer and fully appreciating that there are differences in being in person. But does the availability of that affect the substantiality of the burden? I do not believe so. Again, I think that virtual congregate prayer is an oxymoron. The request here was to be in the presence of a loved one or a visitor and pray together. Mr. Munoz advanced alternative means to do this. He has said, if you're concerned about contraband, you can place us further apart in the room. You can have increased searches. But, again, as the court said in Holt, the question is not whether the inmate can engage in some form of religious exercise. It's whether or not his requested religious exercise here was burdened, and here that religious exercise was congregate prayer, meaning actually to congregate with fellow believers and pray respectfully. The virtual prayer is not an alternative. Counsel, is he able to do that with other inmates? This claim seems to relate to congregate prayer with visitors during the visitor time period. But although in other places there's some general statements about an inability to engage in any congregate prayer, which is it? So, Your Honor, I do not know what the prison's policies are related to congregate prayer. What's your client's claim? I'm sorry? Is your client's claim as to- He is not able to engage in congregate prayer with visitors. Okay. But he is able to engage in congregate prayer with other inmates. That I do not know, Your Honor. In the supplemental brief that-I'm sorry, in the supplemental complaint that he had offered up to the court, he makes reference to Jumu'ah and to the Friday prayers and placement of body oil before going to that Friday prayer. And ADM 819, the religious activity policy that's mentioned in some of the responses and the grievances, talks about that in a context that certainly makes it sound like there's a weekly communal prayer. Is that your understanding of the record? Again, that has-prayer with other inmates is not what's at issue with the case, is what I'd argue. Again, I think our looper requires to look very specifically at what this inmate is claiming. The state has not claimed during this litigation or has not questioned his sincerely held religious beliefs, right? His sincerely held religious belief here is that he needs to pray with his visitors, that he needs to engage in a specific congregate prayer with them by getting-there's a 14-step prayer that he must do. The state never said he didn't believe that or never said that's not part of his religious obligation. So with that being said, and then that practice is banned, and as the court recently said in Davis v. Wiggin, if a prohibition is not a substantial burden, then nothing is. And I think that's how we have to take it. The state here never said, oh, well, he could pray with other individuals. This is not really his religious belief. Or he can pray with other individuals. This is not a substantial burden. That claim was never made. You may be missing the softball. That is, if that is available in terms of communal prayer in that context, does that assist your argument in the sense of it being provided elsewhere but not being provided for the communal prayer with visitors? Well, yes, Your Honor. I would say that the Supreme Court has said that if you allow other activities that allegedly endanger the same interest, then you have to allow the religious activity as well. So is it your understanding of the record that that is made available by the prison? Based on the citations there, it sounds like it, Your Honor, but we'll get back to that on rebuttal. I'm sure the prison can address that too. We've only delved into a bit of congregate prayer, and I'm not sure we've even finished there. So let me ask that we add 20 minutes to both sides. And you will have a green light to continue. Okay. I appreciate it. So let me just kind of set the table. Basically, there are four major errors that we believe in fact this case in nearly every claim. So the first is that the Supreme Court held in Vermeers and Mast that broad formulations of harm are insufficient. Vermeers and Mast? Vermeers and Mast, yes. So you're referring to the concurrence in Mast? Yes. I'm not sure I would characterize that as a holding of the Supreme Court, but a one-justice concurrence. Well, the government, we can rely on Vermeers. The Supreme Court has said that the government may not rely on a broad interest, and it's not a compelling interest in having a policy generally. It's a compelling interest in not granting the exception sought by a specific individual given his or her specific circumstance. Counsel, help us think about the issue of slippery slopes. And part of what we've been hearing for concrete prayer, as well as the other release your client sees, is that if it's allowed, that it would be requested by many other inmates. Yes. And the resources and burden and security issues that would follow create a compelling interest on the part of the DOC. We are to look at this specific case, but we're also told that we can take account of the fact that this is in a prison setting. Is there room to account for a slippery slope concern after Holt and Vermeers? Respectfully, I would argue no. I think the way that the Holt court characterized this was the retort of bureaucrats throughout history. And Vermeers said you must – Is that in Vermeers? I saw that in Holt. Is that in Vermeers? I said Holt. In Holt. Okay. And the court there said we've rejected that rationale over and over again, and we're doing it yet again here. And Vermeers said we have to take each case one at a time. I just want to make sure. So is it your position that aggregate cost is never a proper consideration? No. No, Your Honor. So what the analysis has to be – so, for example, here, Mr. Nunez has requested circumcision. The cost of that is argued somewhere to be between $800 and $3,500. The question here is whether or not the state can bear that cost. There's been no showing of fact here that the government's resources have been strained. Now, down the line, should the state get additional requests or resources become more strained by accommodation, that can be taken into account, but you have to, in each individual case, conduct a search and inquiry as to whether or not the granting of the exception would actually impact those interests. So based on your position, they would have to pay for the procedure or whatever the issue until their resources are strained? It's in a future case, and I think that's an important concept to stress here. And we would argue that the law requires a funding from Mr. Nunez in all three claims. But that doesn't require a broad policy change, and I think that the Supreme Court is clear on this, and Vermeer is you have to analyze each claim one at a time. So Mr. Vermeer is maybe granted an exception here, so the state will have to pay for the circumcision. They'll have to allow him to engage in congregate prayer. They'll have to allow him to consummate his marriage. However, that does not mandate a change to the state's general policy, and down the line, another inmate can come, and if they ask for similar or different accommodations, at that point, the state will have another chance, another bite of the apple to try to actually provide what it should have provided here, which is evidence of a burden. But that burden analysis, that analysis of the expenses has to be done in each individual case. As to circumcision, is it correct, your client, I mean, he points to the, for example, elective termination of pregnancy provision in the policy, but that provides explicitly that the inmate and family would cover all the costs. Has Mr. Nunez offered to cover costs of circumcision? I would say that that's unclear in the record. The state, though, has not. The state could have said we'll allow circumcision, but we can't afford it. They could have offered that alternative. I don't think that's been done here. And also I would point to the fact that I believe in another, so let me start over. In Holt, Roman Catholic diocese of Brooklyn-Lucuni, the court has made clear that you can't allow secular conduct that endangers the same interests as the religious conduct that the state is prohibiting. And so here elective abortion was one, and I acknowledge that the policy does say that would not be paid for by the state. But the other procedure that is relevant here is gender reassignment surgery, and I believe there's a site in footnote 15 of our opening brief here where the state has paid for gender reassignment surgery. That's on the basis of it being deemed medically necessary. Is it your position that RLUIPA puts spiritual health on the same level as medical health? Yes, Your Honor. I think that was the value judgment made by Congress in passing RLUIPA, and I think if we look at Holt, Holt is a perfect example of this. There, the prison system allowed individuals to grow beards for medical reasons, where that was medically necessary to do so. And the court looked at that and said, well, if you're allowing it for medical reasons, then you have to allow it for religious reasons. So, yes, I think any time the state allows, and I think this is clear in the law, is that any time that the state bans a religious activity, they can't say it's compelling if they're allowing other activities that endanger the same interest, here, cost, medical complications, et cetera. Would it satisfy your client's claim for the prison to allow him to proceed with circumcision at his own cost? I think that would have been an alternative means that could have been proposed, Your Honor. But I would also say that under the law, if they're paying for gender reassignment surgeries, they shouldn't treat religious conduct more harshly. Is that in the record that they're paying for gender reassignment surgeries? Again, I think it's footnote 15 of our brief. I don't think it is mentioned in the record below. And the documentation about what they paid for and whether the procedures that actually took place were gender reassignment or perhaps some other gender-reaffirming treatment. I found it, and I know you sent this to a link with a very short press release about this. I didn't see much of a record on this. That is the record that we're aware of. And on that piece, I will also say that the state had an obligation to consider these facts when it was deciding whether or not to allow Mr. Nunez's exception. The state knew that it was gender reassignment surgery. The state knew they allowed elective surgery. They never bothered to try to explain how those two things didn't endanger the very same interest of Mr. Nunez's circumcision. So, Cutter v. Wilkinson. The Supreme Court said that courts are to give deference to the experience and expertise of prison and jail administrators in conducting an ARLUPA analysis. How does that deference play a role in our evaluation of these claims? Well, I think in Holt, one of the key findings, one of the key holdings there of the Supreme Court is that you shouldn't give unquestioned deference to prison officials. And I would argue that the Supreme Court there was really just clarifying what ARLUPA was intended to do in the first instance. The Supreme Court in Turner had given deference to prison officials and advanced a standard where the legitimate peniological interest standard. Congress did not feel that afforded enough protection, enough religious liberty protection to inmates. And so it passed ARLUPA explicitly to overrule that standard. And it chose strict scrutiny. We're all familiar with strict scrutiny. It's used in the context of the First Amendment. It's used in the context of racial discrimination. So, Cutter was about ARLUPA, right? So, is it your position that after Holt, that section of Cutter that applies to deference to prison officials is no longer binding authority from the Supreme Court? Yes. How do you reconcile that with the statements in Holt that ARLUPA affords prison officials ample ability to maintain security, that courts should not blind themselves to the fact that the analysis is conducted in a prison setting? Yes. And I think that you can reconcile those statements. The state has the opportunity to put forward evidence that there is a compelling interest and that this is the least restrictive means given those interests. Here, for example, the state could have, if it existed, they could have put forth evidence and said, you know, Mr. Núñez has introduced drugs or broken a rule on contraband. Could have said that Mr. Núñez has some sort of disciplinary record that mandates denying this. They didn't, but the opportunity is there. They could have... They did, right? I mean, there is an affidavit that asserts that he is of particular concern for transfer of contraband. So, yes, but there was no evidence or detail as to Mr. Núñez on the point. And I would argue that that is actually the level of detail required. And I'll say it back to Ramirez. So there on vocal prayer, the state raised a legitimate interest and they said, well, we're concerned that pastors might not just speak to the inmate. They might speak to witnesses and they create disturbances, et cetera. The court said that could be a compelling interest generally. But the state here has failed to show that this particular pastor, who was supposed to be in the death chamber, posed any of those specific risks. And that is how searching the Supreme Court is now conducting this inquiry and how strict of a standard they are holding to the state. In that case, the state had to show that a particular pastor posed a risk. Here, the state had the obligation to show that Mr. Núñez posed a specific risk with evidence that they claim in this litigation. Going back to concrete prayer for a moment, they do talk about the specific risks associated with people from the outside being in proximity, not being at a table where their hands can be seen, but rather being prone on the floor and moving in ways that could obscure the transfer of contraband. Why isn't that sufficient given whatever remains of the deference we pay for security concerns? Well, I think there are a couple of pieces on this. Mr. Núñez has pointed in the record to the fact that the prison has set aside rooms for playrooms that would present the same interest, playing with children on the floor, there's accoutrements and toys. The state never, as it was required to, explained why it could set aside rooms for playing with children and could not do it for congregate prayer. And I think that was their obligation to do so. Do they really need to spell out the differences in risk between a child transferring contraband and an adult from the outside? The state has the burden, yes, of addressing these issues. If there is a substantial difference and if they can point to evidence that contraband has been introduced in one way or not the other and that there's a difference there, they could have done it. They never even responded to Mr. Núñez's point about the playrooms. What about the specific medical evidence that's available as to concerns about complications that can follow from circumcision? And we've talked a little bit about costs, but those costs could grow exponentially with complications. So a couple of points on that. So, again, complications from surgery are interests that are also posed by the elective abortion and gender reassignment. Two, Mr. Núñez offered, if there were complications, and this is in our briefing, that he would be responsible for those costs and would be willing to sign a liability waiver. Is that really meaningful? I mean, if he ran out of funds, was indigent, the Eighth Amendment would still require that treatment be provided, right? Perhaps, Your Honor. But there also is very little in the record that Mr. Núñez, if there's anything that has helped that would make him likely to have any sort of complications from circumcision. Circumcision is a relatively simple procedure, particularly compared to the others that are allowed. And so, you know, no one is denying that costs or potential complications generally can be an important interest. The question is whether or not there's anything in the record here that says allowing this one exception for Mr. Núñez to get a religiously required circumcision would burden the state. Let's say colleagues have more questions on those two. Let's talk about the conjugal visit request. Okay. Is your client requesting at this time both the consummation of marriage visit and the ongoing biweekly visit? Yes. And I think in the amended complaint, paragraphs 13 and 14, it talks about this. It says there's consummation, which requires three nights together with his wife. And then his faith requires him to be with his wife every three days, unless it is clear to both spouses that the absence is temporary and involuntary. And so I think there are two pieces to this, the initial consummation, being allowed to consummate his marriage with his wife, and then the ongoing conjugal visits. And I'll mention that, again, in this case, nobody has questioned that that's a sincerely held belief or that it isn't part of his religious belief. The DOC points us to, I believe it's a statute, and says that they are obligated to monitor all visits. And my understanding from Mr. Núñez's position is that any acts of intimacy have to take place in private, even a kiss. I guess my first question for you is, did Mr. Núñez challenge the underlying law that the DOC is pointing to as part of the original case below? I think what Mr. Núñez was arguing there is that the policy as applied to him burdens his religious liberty, and therefore there should be an injunction against the enforcement of that policy against him. So both the DOC policy and the underlying reason for the policy. To the extent that DOC is arguing that it has to monitor the prisoners, it has the option at that point to find a less restrictive means than a complete ban to conjugal visits. Even the four schemes that you point us to have very specific eligibility requirements. First of all, can we take judicial notice of your client's criminal record? Yes, Your Honor. And that criminal record, does that include first-degree murder and other violent offenses? I believe so, yes, Your Honor. To clarify, is his sentence a life sentence, and is it with or without parole? Your Honor, I'm not familiar with that type, and I'm not sure. Okay. Given that even with the legislative or policy schemes to which you point us as examples, that someone with that background might be excluded, is there really anything more than that criminal history that the state would need to point to to show that a total ban was the least restrictive means in this circumstance? What I would argue, Your Honor, is that that was never an argument made in this case. If they thought that that was a compelling interest to deny his conjugal visits, they had the information to do it. They could have made that argument, and they didn't. Here, the state itself, early on in the grievance process, noted that there were six other states that allow conjugal visits, at least six based on, I think, what they called brief research. The state made no effort, despite knowing about that, to argue why those states could allow conjugal visits, at least in some circumstances, and in several cases, broad circumstances, but they couldn't offer that to Mr. Nunez here. Are you representing your six? What is there besides California, New York, Connecticut, and Washington? Let me give you the site. I recognize they said that at one point, but I'm asking you, are you representing that there are six other jurisdictions? No, Your Honor. I'm representing that California, New York, Washington, and Connecticut allow, but the state itself said after brief research, it appears that six states allow conjugal visits, and the only response to that is that that shows that we're in the majority. But that's, again, not what our loophole requires. Given the fact that the state was aware that six other states allowed conjugal visits, it had the burden of showing why it could not offer a similar exception here. Holt says that RELUPA doesn't require a prison to grant the accommodation as soon as a few other jurisdictions do, but when so many offer an accommodation, then they must offer these persuasive reasons. So how many is so many? The way I interpreted that to Mr. Holt, because I kind of struggled with that as well, is that just because one state does it doesn't necessarily mean that another state has to do it as well, or a couple. But I think that the sentence that follows is that the state then has to provide persuasive reasons why it cannot do what that state did. So it's not an automatic one-to-one just because one state has chosen to allow this that another state has to. All the state has to do, which the state failed to do here, is say, we're aware that these other states do this. This is why we can't do it here, and offer persuasive reasons to do so. And, again, this is just another circumstance where the state has failed to meet the burden. They might be able to do so in another case with another defendant, but they haven't done so here. No specific evidence as to Mr. Nunez regarding the compelling interest. No addressing the fact why they allow certain secular conduct, but not analogous religious conduct. No discussion as to why other states can allow each of these thought items. No showing that they've considered and rejected as required under Washington v. Clem different alternatives. The law is very clear on each of these four points, and the state failed on each one. Does the inference cut the other way? When there are other jurisdictions that allow the practice, there's this sort of heightened showing that needs to be made. Does the absence of other jurisdictions' allowance of the practice cut the other way? I would argue no, Your Honor. And, again, the reason why is I would go back to the inquiry here, not being whether or not the general policy of the state is motivated by a compelling interest. The compelling interest analysis goes to making the exception. And where the conduct of other states comes into play is making that exception. Is it possible to make that exception for this prisoner for that religious reason? This one time, is there a way to do it? This is not analysis as to whether generally a state may want to allow conjugal visits or whatever the conduct may be. Sorry. No, no. I'm done. Following up on Judge Montgomery-Reeve's question, is there any other type of visit that you can point us to where there is not some kind of monitoring, whether it's by in-person surveillance or by video? And the two examples that you do point us to for special visits, the religious advisor or lawyer, aren't those subject to monitoring? I believe so, Your Honor. Is there any example of a circumstance where prisons allow completely unmonitored visits? I believe in the states that allow conjugal visits, there are circumstances where inmates have privacy to engage in intimate affairs, in terms of the specific prison system at issue here that I'm not sure of. Other questions? Just one moment. Are you familiar with the death bed and visitation policy? At the present time, no, Your Honor. Okay. A final question I'm going to ask you to at least think about and we can discuss further on rebuttal is, to the extent that we agree with you on the state not making the type of evidentiary showing that is required under RLUPA, if we were to reach that conclusion, what's the appropriate disposition here? Would that warrant a remand for the district court to apply a standard that had been articulated in more detail by this court and renewed motions, perhaps even cross motions for summary judgment? Or would it simply be vacating and remanding for the case to proceed to trial? Would you like my answer now or should we wait for rebuttal? If you have an answer now, I'll take it. If you'd like to think about that, you're welcome to do it. It's something I've given quite a lot of thought to and we've discussed. And I would say here the proper course would be to reverse and let the case proceed to trial. The record is the record. The state had its obligation and had its opportunity to present the evidence. It didn't do so. If this case were remanded for further consideration of legal issue because the record is fixed and the law is still clear, the district court below would have to reach the same conclusion that I believe that this court has to reach. Second point is Mr. Nunez has been litigating this case for close to a decade. And it's close to a decade where he hasn't been able to exercise his religious beliefs. This is a case of justice delayed, justice denied. And I think the law is clear enough, the record is barren enough that that's the proper course. So I understand you'd like us to direct the district court to have the case proceed to trial. But would anything limit the district court from permitting additional discovery within its discretion? That's a question, Your Honor, that I'll have to think about for rebuttal. What if, for example, on the issue of conjugal visits and a carve-out for those who commit violent crimes, circumstances, we have nothing in this record about the criminal history or any disciplinary history. But if, hypothetically, there were such evidence that came to light, wouldn't the district court at some point, even mid-trial, be able to determine as a matter of law that the standard had been satisfied? Is it really appropriate to say this just goes to trial? If you'll permit me, let me think about that and take that back for rebuttal. Thank you. Ms. Terbinger. Well, seeing that 35 is a little intimidating. Good morning, Your Honors, and may it please the Court. My name is Abby Terbinger. I'm counsel for the Pensing Department of Corrections and also the corrections defendants in this case. As Your Honors are already well aware of the standard used in this case, and the parties have fully briefed that, I'm not going to go into it. But I would like to just clarify one point that I think the district court judge may have missed. The Department is not conceding that Mr. Nunez has shown a substantial burden with regard to both the congregate prayer issue and also the conjugal visits issue. It's our position, although it seems that the district court judge may have assumed that. We did, you'll see from the briefing and what was discussed below, some of the points that Your Honors raised. And particularly I'd like to start with the congregate prayer with visitors issue. It is the Department's position and the Department defendant's position in the case, I guess I should refer to them as appellees, that Mr. Nunez has plenty of opportunities to do nearly exactly what he's asking for in this case. He states that he's a Muslim and, indeed, don't challenge that sincerely held belief. However, he indicates that he needs to pray in a congregate manner, following the 14 steps that my colleague mentioned, with visitors in a private setting. Now, that sort of evolved from when he first made the request. He was first asking for it in the visiting room at the institution. And then it evolved to he sort of conceded that, well, that might be a little too disruptive. And so I need a private area to do that. But it's the Department's position that he can pray before or after the visit. These visits aren't really more than about an hour in length, generally, to comply with his need as a Muslim to pray five times a day. And he can also visit or he can also pray in specifically in a congregate fashion when he goes to GMO on Fridays with other inmates in that type of setting. He just can't pray in a private room with visitors, you know, in the visiting room area. He also put on the record that his faith says that his prayers are not heard by God, as well when he prays alone. I think something along the lines of 20 times stronger if they're with other people. And he specifically, of course, talked about the prayer that he needs to engage in with his wife. So would you agree that if he's unable to have his prayers heard with the strength with which he intends to offer them, then that would be a substantial burden? I would concede, Your Honor, that that's a burden. I would not concede that it's a substantial burden based on how the courts, as the Third Circuit and the United States Supreme Court have defined it. And what's the line between a burden and a substantial burden? Well, I think you'll see as the courts in past have examined this issue under RLUIPA that substantial burden, and I'll just not use my own words, but perhaps use the words of someone much smarter than me, is when a follower is forced to abandon the precepts of his religion and forfeit benefits otherwise available to other inmates. That doesn't really come into play here because this isn't something that's available to other inmates, the ability to have a private visiting area to pray with their loved ones. Or the government puts substantial pressure on an inherent to substantially modify his behavior and violate his beliefs. Again, inside the institution where he's not coming into contact with visitors and so forth, he may pray by himself, he may pray with others, other inmates. He may pray at Juma where several, sometimes several hundred inmates of a Muslim faith are gathering together and performing these prayers. So he has this opportunity for congregate prayer, which really seems to be the heart of what he's looking to do. Is the record clear that the visiting hours do not interfere with the times of day when he needs to pray? It's not. What I believe the information in the record is that it's, you know, I think it's from 7 a.m. to 7 p.m. seven days a week. Now that, again, was in relation to the prison that he was at at the time, but I don't think there's much variation from prison to prison. But those times are pre-scheduled by the folks who are coming to visit. I believe the visitation policy indicates that they're scheduled in advance, a couple of days in advance. And, again, they're for about an hour. So it's my understanding people of the Muslim faith pray five times a day, generally speaking, and there's a window of time for each one of those prayers. So Mr. Nunez and his family could certainly schedule a time that's not going to conflict with that mandatory prayer time. They could pray as they wish, he could pray as he wishes, and they could engage in visitation in the visiting room, which is really what it's intended for in its general purpose. There is already a private room that's available and is, in fact, used for congregate prayer among inmates, and there's already a sort of protocol for monitoring and security of that collective prayer. Why can't that be provided with a sort of minimal additional burden for the prison for Mr. Nunez and visitors? I think it's important for the court, and I appreciate that question, but it's important to consider that that type of congregate prayer would take place inside the institution. I'm using that word kind of loosely, but, you know, behind the prison walls where we're talking about only corrections employees and inmates being present. The type of accommodation that Mr. Nunez is seeking is very different. He's asking to pray in a private area, perhaps off the visiting room area, where people from the general public are permitted to come in, visit with their loved ones and friends and family members and so forth. While there is surveillance of that area and there are, you know, folks watching what's going on, that, I think from the prison's perspective, is a much more dangerous, much more untenable area of the prison because you have all of these folks coming in from the outside. And so while there are security measures in place, Lieutenant Woodring in his declaration at the lower court made very clear that visitors coming into the institution is the main avenue of introduction of contraband, whether that be cell phones or some sort of controlled substance. We know that things come in even beyond, even taking into consideration all of the security measures that the department has in place. So the declaration says that Mr. Nunez has shown himself to pose a direct threat regarding the introduction of contraband into the DOC, into the prison. Is there any evidence in the record to support that assertion? That is our main assertion with regard to Mr. Nunez in particular, that he poses a particular security risk with regard to introducing contraband into the facility. I mean, I see that in the declaration, but my question to you is, do I have, is there anything in the record to show a past history of misconduct charges? Is there anything else other than that assertion to back up that assertion? There's not, Your Honor, and I think the rationale behind that from a security perspective was that perhaps it's not appropriate to put some of that information out there to the public sphere who can access it. But that is evidence that could have been put before the district court, even under seal, right? And on what basis could a court conclude from that assertion that the risk he poses is anything greater than any other prisoner? Well, again, there's information that he poses a particular security risk, which I think points, Your Honors, to him in particular. But I would concede that most... But where is that information in this record? And now that we're in the realm of Holt and Ramirez, isn't it your obligation to demonstrate, make an evidentiary showing, not just to say so, that he poses a particular security risk? I would concede to the court there are no misconducts, there are no particular investigations or things of that nature that would delve into the specific concerns of Mr. Nunez and the security risk that he poses. Most of the implications from this case arise from security's need to look both backward and forward. Security personnel from the department are looking at things that have happened in the past with a particular inmate, with other inmates at that institution, et cetera, and trying to mitigate risk. They're also, as Your Honors acknowledged in the questions I think to my colleague, they're also required to look forward, right? They're in the job of anticipating risk. And when you're talking about something in Holt, which was the inmate having a short enough beard to conceal contraband, the facts are important in that case. And I think the main reason the United States Supreme Court overturned that case and held that Raluca was violated were a couple of reasons. First of all, as my colleague pointed out, medically necessary. If it was medically necessary for an inmate to have a longer beard, the department permitted that. In addition, I think the Magistrate Judge... Before you move on from that point, why is that different than the fact that this room on the side is used for other visits? I'm sorry, can you repeat that, Your Honor? As I understand it, the room that was being referred to is used for visits with attorneys, for example. Is that incorrect? I'm not sure exactly the room that Mr. Anunez was referring to. I know that he raised the issue that was also raised today with an area where parents can visit with their children, et cetera. I can tell the Court that that is not its own room. That is an area within the overarching visitation room. The same is true for meetings with religious advisors. That takes place in the main visiting room, and it might be in a corner of a visiting room or something that might be a little quieter. There is, in the prison, an area that is set off for, for example, meetings with counsel. Yes, that is true, Your Honor. And he has raised the prospect of being in one of those no-contact rooms where the congregate prayer could even be across the table from each other. How is that any greater of a risk, a compelling need, than meetings with counsel in that room or visits outside, that is, in the main room? But in the side room, it addresses the concerns that have been raised by the prison about distracting others. I think my best response to that, Your Honor, is importantly in Cutter v. Wilkinson when the U.S. Supreme Court was addressing a facial challenge to RLUIPA. Justice Ginsburg talked about this idea of non-beneficiaries of this particular accommodation being negatively impacted. When you're talking about attorney and client rooms, they're hot-ticket items, right? Many inmates want to meet with their attorneys. They want to do it in confidentiality, entirely understandably. And so if we say that an inmate can utilize that room to meet with visitors and pray, you're then taking away that opportunity for an inmate to use that room to meet confidentially with his attorney in that area. That may be so, but isn't that exactly the point? To demonstrate that there is, in fact, a compelling need and that the ban is the least restrictive means to do it, that the state has to put in evidence, like the number of rooms, the times that they're available, if they're booked all the time for attorney visits. And so those places are not available. Issues around effects that that might have on the rest of the population, the risks that a particular prisoner poses because of disciplinary history or, as you were describing earlier, incidents with others at the prison. But we don't have any of that on this record. So how can we say that the district court, in concluding that the state has met its burden, was properly applying Holt and Ramirez? So I think it's important to consider, and Justice Sotomayor very eloquently, much more eloquently than I could say in the concurrence to Holt, talks about the idea of the government not necessarily in the least restrictive means analysis, not necessarily needing to refute every possible option that could exist in the realm of the prison system for this to happen. What the prison is expected to do is consider the alternatives, I'll call them, that the inmate poses. I don't recall, Mr. Nunez, in any of the religious accommodation request or the grievance, and my recollection may be failing me because I see Your Honor is diligently writing this down, or the amended complaint talking about, well, the amended complaint would have been passed due. The department would have already had to make a decision at that point. But in the religious accommodation process and the grievance process, I don't recall him saying, hey, if there's an attorney-client room and if it's not in use and if you department require me to schedule this, you know, a week, two weeks in advance, then can't you accommodate me? And so that's not something that the department responded to. But Holden Ramirez says that that's not his burden. It's very, very specific. It is now the government's burden under ALUPA to consider reasonable alternatives and explain why they're rejecting them. So let's just assume that that's the case. That's what the cases say. So why didn't the department do that here? I guess all I can do is refer Your Honor to language in Holt where Justice Sotomayor says, I do not understand the court's opinion to preclude deferring to prison officials' reasoning when that deference is due. That is, when prison officials offer a plausible explanation for their chosen policy that is supported by whatever evidence is reasonably available to them. And she goes on to talk about this least restrictive analysis. And she says, nothing in the court's opinion suggests that prison officials must refute every conceivable option to satisfy RLUPA's least restrictive means analysis. Go ahead. But you just read that it has to be, according to the concurrence that you just read, supported by evidence available to them. There are statements in this, in the affidavit, where is the support by evidence available to them? So, for example, you know, Judge Crouse just gave you a list of things that probably could have been said that would support the statement that, you know, well, there could be an issue with other attorneys who want to visit with their attorneys during that, other inmates who want to visit with their attorneys during that time. Where is the evidence that supports that? So the department's ability to present evidence in this case, I think, has to be considered in the context of the fact that this doesn't, isn't currently in existence, right? There are no prisons in Pennsylvania that have a private visiting room for folks to, for inmates to meet with their family members for religious purposes. It just doesn't exist. So everything in the department is. That's entirely circular. The question is, why can't rooms that are available, for example, for meetings with counsel be used for this purpose? To say they're not used for this purpose just doesn't really help us with, you know, understanding why those options weren't considered by the state. And to piggyback on that, to say there's no evidence doesn't help us either because Judge Crouse just went through a list of things. Presumably those are being used to meet with attorneys. How often? When do the attorney meetings happen? Are they during the visiting hours? Is it such that the rooms are never available because it's such a hot ticket item? Why couldn't that type of evidence be presented? I would submit to the court that, you know, there is evidence that could have been presented below that would have made this a more robust record. But as it stands, even if the department, let's say hypothetically, had an attorney-client room available and it was at the exact same time that Mr. Nunez wanted to visit with his family, we still have the compelling government interests that I would argue outweigh the option of an attorney-client room because we're talking about someone who's asking to meet with several members of the public to pray in certain ways that are going to obfuscate what he may or may not be doing with his hands. And we haven't really talked about this at all, but we have the department's concern with scarcity of resources. If this inmate is permitted to go use that room to visit with family and friends, the department would have no other choice but to allocate a one-to-one person watching what's going on and trying to glean whether there's any sort of contraband involved, et cetera. When prisons are designed and built in Pennsylvania, and this is in Lieutenant Woodring's declaration, they're designed in such a way that the visiting room is specifically considered for the reasons I've already raised to your honors. What about an attorney room being used for Mr. Nunez to meet with one family member and pray together? And what's the size of the room? There's a table typically in between for counsel. If they're on different sides of the table but in that same room praying together, how does that pose any more of a security risk than the inmate meeting with his attorney? They're good questions. Through the course of this litigation, I think my colleague mentioned the initial complaint was filed in 2013, I believe. Then Mr. Nunez filed an amended complaint in 2019. When I went back and looked at where he's moved from prison to prison in response to the court's question about mootness last week, he's been to several different prisons. Prison layouts are all different. So, you know, to be able to answer your honors' question about how big is the room and how often is it available, that would have changed, right, since the motions for summary judgment and the evidence was presented below. Because Mr. Nunez is now at a different location in a different prison with probably different types of accommodations. So even if we were to accept that the department put on evidence of compelling reasons, isn't there a material dispute as to whether Mr. Nunez has, in fact, shown himself to pose a direct threat regarding introduction of contraband? I mean, that is what Major Woodring says in his affidavit, but we also have a sworn declaration from Mr. Nunez saying that he's never been issued a prison charge for smuggling drugs into any prison. He's never been issued a misconduct for violating any visiting policy rule, and that he's a CL-3 inmate, which is someone who has non-assaultive behavior. So wouldn't that alone require the district court to deny summary judgment? I don't believe so, your honor. I think the district court in this case considered all of that evidence and considered the department's compelling government interest in safety and security with regard to the congregate prayer issue and took Lieutenant Woodring's assertion that Mr. Nunez poses a specific threat over and above all of the other factors that were raised that created a security risk for the department with regard to the congregate prayer and said this is enough to meet RLUIPA. They've shown a compelling government interest, and they've shown the least restrictive means here, which is, unfortunately, that Mr. Nunez can't engage in congregate prayer in the visiting room or in a private room with his family. So it is appropriate for the district court to make that decision as a matter of law, notwithstanding any disputes of fact? The government filed a motion for summary judgment. We submitted our evidence to the court. As your honors are aware, that's the time for Mr. Nunez to respond and create a response to the government's position along with all of the other filings that are part of the record in the case. And the court can make that decision as to what material facts to believe and not believe when they're evaluating it based on summary judgment. But we have here a burden of persuasion that shifts. This isn't just a burden of production. And you had stated earlier that the state only needs to respond to alternatives that the inmate raises. That's no longer the case after Holt and Ramirez. That burden is on the state to consider, identify and consider alternatives and give an explanation. It doesn't have to be exhaustive, as you pointed out, with some of the concurrences. They were making clear that there has to be some consideration of alternatives. And here it doesn't appear that the states even responded to the particular alternatives that were raised by Mr. Nunez. For example, in the area of congregate prayer, right? I'm sorry, in conjugal visits. With conjugal visits he's offered up a number of things that would seem to go to address the security interests. Additional screening, a button for a panic button if there were a problem in the room, someone monitoring outside. Those aren't even addressed by the state. So given the burden that's on the state, how do we not have a disputed issue of fact here? So I think if we're moving to the conjugal visits issue, Your Honor, in the context of that discussion rather, I would concede that the department is agreeing that an outright ban is the only least restrictive means in the case where Mr. Nunez is asking for a private visit with his spouse, unsupervised, et cetera. There really is no least restrictive means but for the government to say no, given all of these compelling government interests that are at stake. But how can that be true when somewhere between two and six states allow inmates to have conjugal visits? So as Your Honor mentioned earlier, there's not a lot of evidence on the record about this. Mr. Nunez brings up the point, I think, in a grievance that he filed in the department response, as was mentioned by my colleague, is that he believed in his basic research that there were around six. It's my understanding, based on the court's assertion, that there are now four. I would suggest to the court that in the 1990s you can take judicial notice of the fact that there were about 19 states that allowed conjugal visits in the United States of America. And in that timeframe, it has been whittled down to four. And if you look at the policies of those individual states, they're very, very restrictive as to what inmates can engage in this behavior. And as Your Honor's noted earlier, just because another state does something doesn't mean that Pennsylvania is required to do it as well. If Pennsylvania isn't required to do it, why not put in evidence? So if you know, you can do a quick Google search and figure out that 19 states used to have it, and now that's dwindled down to four. Why doesn't the burden require the state to put in some evidence to explain their budgetary concerns? Here's what that looks like. Here are specific concerns from the 15 states that no longer do this. Here's evidence of that to give us some evidence to satisfy that burden. I mean, I think that we could all look back on a case that we had and think of other evidence we could have submitted respectfully to the court. At the time we submitted information from security personnel and from a medical, it was the director of the medical department with the department at the time, because those were the two primary compelling government interests at stake, you know, with various bullet points underneath of each one. But, you know, I think at some point we do have to defer to prison officials when they're saying we have a lack of resources. This would require, in the case of congregate prayer, this would require us to alter the way that visitations occur within the prison and perhaps even add on to the prison. And, you know, Ralupa is an interesting animal. I've been working with it now for about seven years, and my take is this. It's impossible to consider an inmate's position in a vacuum with Ralupa. Yes, the cases say you have to consider his individual situation, and yes, that needs to be done in each case. But from the prison's perspective, as soon as, let's say hypothetically, Mr. Nunez's accommodation was granted with regard to the congregate prayer issue. As soon as the department grants that, that then moves the ball, right? That then is the least restrictive means. So there is no way to say to inmates 2, 3, 4, 500, 600, who now ask for this accommodation, I'm sorry, we can't do that because this particular prison doesn't have the space available. Well, that doesn't sound consistent with what Ramirez said, because Ramirez, to me, says that the prison gets to express a compelling reason as to the individual applicant for an exemption, right? So if Mr. Nunez were granted an exemption for one of his three requests, then the next person who comes along, if they had, say, a history of bringing contraband into the prison or something, then, of course, the department would be able to consider that. So I don't think it's automatic that every applicant would get the same exemption for religious reasons as Mr. Nunez. Perhaps not, Your Honor, but I think it does make it much more difficult for the government to ever argue that the least restrictive means analysis does not work in the inmates' favor in that case. I think that's the point of Arlupa, that it does, it necessarily works in the inmates' favor, and that the government is, I mean, that's what the statute said by its plain terms, and then we have these cases that, you know, three of them, I guess, Cutter and Holtz and Ramirez saying that this really, really means what it says. Like the prison has to show why these people who can't, who have limited freedom to exercise religion on their own because of their incarceration, can't exercise in their faith, right? So, I mean, that is what has landed in your lap as representative of the Commonwealth. So I guess, you know, they see pretty limited details in this record as to Mr. Nunez specifically. In the Major Woodring Declaration, you know, that one conclusory statement about how he's shown himself to pose a direct threat. So if we assume that you, I kind of want to take you here to one of the questions that Judge Cross asked of your friend on the other side, which was, you know, just assuming for the moment, if we were to find that summary judgment was not warranted on any of these three requests, then, you know, where does that take us? You know, I would imagine that you would want to put additional evidence in the record. Would that be appropriate? We think it would, Your Honor. Obviously, this court can clarify exactly what is necessary under RLUIPA in these circumstances. These are novel issues, and I would argue that Ramirez versus Collier and even Holt were very different because those were, Ramirez was an execution chamber case where the prison in question had for many years allowed religious advisors to come into the execution chamber to pray over inmates who were about to be executed, to lay hands on them, et cetera. That's not the case here at all. This is not a type of accommodation. None of that, none of the three requests Mr. Nunez is making are the type of accommodation that the Department of Corrections in Pennsylvania has allowed, and they are the type of accommodations that would be far reaching beyond Mr. Nunez's particular circumstance. Well, it's maybe a different scenario, a different type of relief in that sense. But aren't there general lessons that are to be drawn from those cases? For example, that you can't just say we've got generalized concerns about having someone inside the execution chamber, that the state could perhaps address that by putting certain limits and restrictions on what they can do and when they can do it, and that the state needs to address those. If we were to say that that wasn't done here, why is that saying anything new? And why wouldn't sending it back for some additional fact-finding other than by a trier of facts at the trial just be giving the Department of Corrections a second bite of the apple on summary judgment? So the general legal tenets absolutely apply from those cases to this case. And to answer Judge Freeman and your question, Judge Krause, if the court were to re-mand the case, that would be exactly what the Department would intend to do. We would try to, based on the court's analysis of what has already happened and application of a LUPA and et cetera, this court's analysis, the Department would seek to file supplemental motion for summary judgment with additional evidence which Mr. Nunez could respond to in kind, applying their LUPA standards. And that's how we would move forward. That's how we would seek to move forward in this case. And what's your authority for that, for just having the opportunity to supplement the record where the legal standard under which you developed the initial record was already established? So I think it's entirely, every judge wants to get it right, right? And if wanting to get it right means that there's more information that needs to be known about the particulars of the prison that Mr. Nunez is located at now or the virtual visitation policies that Your Honors keyed in on earlier, are any of these changed circumstances since the original motion for summary judgment was filed? And it's entirely appropriate for the government to supplement the record. Because the district judge wanted to get it right, just like Your Honors wanted to get it right. And if that means there's more factual development that needs to take place, you know, there are many options. The court can entertain the Department's request for a second motion for summary judgment. I've done that in cases where my initial motion for summary judgment was procedural in nature. I'm sorry, I guess I'm talking about the motion to dismiss, was procedural in nature. And then I filed a substantive one later on or we could have an evidentiary hearing. Here, given what the state put in, that is three affidavits, that by their terms are talking about legitimate penological interests, if we're left with the impression that there are genuine issues of material facts that are in dispute here, why would there be just another try at summary judgment? I mean, isn't the fact finding that it would need to be remanded for the resolution of those genuine issues of material fact a trial? I think respectfully, on remand, the district court judge would have the opportunity, especially in reading the arguments here and attempting to discern exactly what's going on at the prison that Mr. Nunez is located at now, could certainly entertain the government's position that more evidence would assist in the court's determination of whether summary judgment was appropriate in this case, based on Mr. Nunez's circumstances, the prison layout, and all of the points that your honors have honed in on today, and what that means in regard to the red loop analysis and these restrictive alternatives that may be available. What do you say to your colleague's point to the extent we have discretion, and if hypothetically we were vacating and remanding and giving instructions one way or another in terms of moving forward on the trial or just further development of the record, what do you say to the point that this case has been in the making for 10 years now, and it may be the case that justice delayed is justice denied. Does that proverb apply here, and is it one that should affect our thinking in any exercise of discretion in the disposition of this case? I don't think it does, your honor. As I indicated earlier, Mr. Nunez, who is filing per se, filed his original complaint, I believe, back in 2013. There were procedural mechanisms, motion to dismiss, et cetera, and he chose to continue filing amended complaints, the most recent one of which was 2019. The government has not delayed this case and I would argue should not be, quote-unquote, punished for the length of time that it's taken. Of course, we've had a pandemic in there in the mix of all of that, which may have, you know, I don't know, I'm speculating at this point, but may have affected the court's ability to review the record and timely, not timely, and respond, et cetera. But, you know, Mr. Nunez ate up at least five years of that 10-year period, and the government has responded timely to every filing that it's filed in the case. I'm sorry, what were the five years of filing that you're referring to? My recollection is, and I don't have the entire history at the lower court level before me, but my recollection is that his original complaint was filed in 2013. That his, I believe it was amended, not second amended, complaint was filed in 2019. The parties engaged in summary judgment motions. I believe there was also, in fact, I know that there was a motion to dismiss with regard to defendant Tom Wolfe. He was dismissed from the case for lack of personal involvement. It was the first six years before the amended complaint, and the motion practice fits now before us. I'm sorry, was your Honor's question what happened in that first five years? In those six years between 2013 and 2019. I'd have to look at the docket to give your Honor an accurate description of, you know, things that may have been filed in the case. In fact, it wasn't even my case at that time. That's probably why I don't have personal recollection of it. I have a question for you that I think I know the answer to, but I want to hear you say it. Mr. Nunez has been moved. In his current prison, does he have the ability to engage in congregate prayer with his visitors? No, he does not, unless, and I failed to mention this earlier, unless you consider the department's visitation policy that visitors and inmates can engage in prayer in a seated, quiet position in the main visiting room. That is an option for him, just like it would be for anyone of any faith proclivity. I have one more question for you. I want to ask you the same question that I asked Mr. LaGarreta about Qatar. So in 2005, in Qatar, the Supreme Court said that courts, considering our loop of claims, have to accord due deference to the experience and expertise of prison and jail administrators. And then, of course, there has been quite significant developments with Colts and then, you know, more recently Ramirez that make clear that, you know, that the prison officials must consider alternatives, even if they haven't been suggested and so on. And so what do we do with that line from Qatar about due deference? How do we reconcile that with the guidance that we got from the court in Colts and Ramirez? So my recollection of the analysis in Ramirez was not that they didn't give the government's position due deference based on the fact that they know how to more properly run their prison, et cetera. It was that that deference is not unfettered. The government can't just say, for example, no, we're not allowing this accommodation at the prison level. And then through the course of litigation, you know, counsel say, well, there's this compelling government interest and there's that compelling government interest. There has to be a little meat on those bones for the court to look at and provide an analysis of that compelling government interest in the least restrictive alternatives argument. I don't think that the court at all was saying we don't provide some deference in circumstances where prison officials are involved. I think they were saying it's got to be a weighted analysis. We're not going to, as a court, just take what you're saying blindly. We're going to do that analysis and determine what we think is the most appropriate circumstance. I would argue that I think the government's position was somewhat undercut in Ramirez, respectfully to that prison system, with what I've already mentioned earlier, which is that, and the court mentioned this several times throughout their opinion, that preying, you know, over someone who's about to die in the execution chamber has been something that's allowed for a long time. The government really didn't. In fact, I think their own policy even permitted it to an extent. And they just said no to that inmate. And then, you know, through the development of the record, there was discussion about, well, this could happen or that could happen. That's speculation. We don't have that in this case. We have a security official saying, and I'll just go back to the congregate prayer issue because that's kind of what we've been focusing on during my portion of the argument. We have a security official saying we're talking about a visiting room where we know is the main avenue of contraband. We're talking about a type of accommodation where this inmate is asking to do things in such a way that it will be very hard to view what is going on among those visitors and that inmate in the visiting room at the time. We also have a scarcity of resources issue that I mentioned earlier, and this was all developed somewhat in the record through the security personnel that, look, we only have so many corrections officers to devote. And I think the court in Watson v. Cristo, we didn't really talk about that case today, but the Third Circuit has very clearly acknowledged, you know, scarcity of resources is a legitimate thing for the department to put forward. I seem to recall reading a line in Ramirez where the government wasn't arguing that, which sort of makes sense, right, because we're talking about an individual in an execution chamber. It doesn't cost the government any money to allow his religious advisor to come in and pray over him. But in this type of case, it's a very real consideration for the department, which is why it was put forth at the lower level. Not only do we have a scarcity of resources when it comes to corrections officers who would need to now be diverted from their other role or perhaps added to the role on that day to watch what's going on in this private visiting room, but we also have the very real implication that prisons would have to adapt. If the court found that Mr. Nunez, that Raluca required the department to accommodate Mr. Nunez in the way he's asking for, prisons across Pennsylvania would have to adapt to that, and that would be an expensive endeavor to undergo. Same with the conjugal visits case. The arguments are very similar. You're on our time now, and I have a couple questions for you. One about the conjugal visits. And to better understand nonreligious circumstances where it appears the department does allocate these resources, which are now for private visits, and that is the deathbed visitation policy. Are you able to speak to that policy? It is not something I deal with very often, Your Honor. It's not something I remember reviewing from the record. I know the department, DC Admin 812, talks about visits in general, rather. Did Your Honor, if I may ask you a question, did you see that in the visitation? Section 5 of ADM 812 seems to provide for private viewing or deathbed visit with staff escorting the inmate, even outside of the facility, providing the transportation needed, and I would imagine providing the security that's needed as well. And I was interested in your views on why what's being requested here really poses more of a burden than what seems to be available in Section 5. So as I'm reviewing this, Your Honor, my recollection, and it does begin at Joint Appendix 220 of the record and goes on there through Section 5. This, I believe, is referring to a process that the department undergoes if I am an inmate in a correctional facility and my mother is dying. There is a furlough process that I, if permitted, and there are certain circumstances where it may not be. I'm not super familiar with that, but if it is permitted, then there's this process that, you know, of course the inmate has to be taken off the grounds. They have to have security when that occurs, very similar to if an inmate had to go to an outside hospital for their own medical procedure or something like that, then that would be afforded. So doesn't RLUIPA elevate the religious exercise to, you know, at least that level of importance? And where consummating a marriage, for example, is required as part of an inmate's faith. Why would accommodating that pose any more burden than the private viewing or deathbed visit? You know, I guess I would argue that the circumstances are different there. You're talking about an inmate perhaps having one last opportunity to see a loved one before they pass away. I don't think it's very analogous to the situation where Mr. Nunez is asking for, you know, a private room on prison grounds to engage in sexual conduct with his wife. There are, of course, all of these other compelling government interests with that interaction that are laid out in the declarations below. But I guess my response, Your Honor, would be that from our perspective, they're not analogous situations. Are you, in responding, are you differentiating at all between the consummation of marriage and his request for ongoing visitation? They are different, without a doubt. But it's the Department's position that the compelling government interests that apply to one also apply to the other. Isn't the burden significantly different if you're talking about a one-time event versus biweekly indefinitely? The burden is different, without a doubt. I think I would submit to the Court, and this is part of the record, Mr. Nunez and his wife married after he was incarcerated. So it's no secret, you know, his circumstances and not being permitted to engage in sexual acts, they still chose to marry one another, which is perfectly fine, and the Department permitted that based on its rules. But the consummation of marriage, you know, so violates the government's compelling government interests in this case, which is why the Department did not engage in an outright ban of that type of conduct. Unfortunately, now that you've been out there longer, I thought of another question for you. I think this really will be my last one. The Major Woodring's affidavit refers to 37 Pennsylvania Code 93.3 for the proposition that inmates in general population will be permitted contact visits under official supervision. And it refers to the inmate handbook. Is there anything in the inmate handbook that delineates what official supervision means? Oh, gosh, I think you stumped me on that one, Your Honor. I don't know exactly what's in the inmate handbook about that particular issue. It's definitely the government's primary concern that if conjugal visits were permitted in Pennsylvania as it stands, they would have to be supervised. That, you know, has a whole other can of worms when it comes to requiring a corrections officer to watch what's going on. And it, of course, wouldn't meet Mr. Nunez's requirements that he states that it needs to be an entirely private interaction and it would be an affront to his religion if it was. I guess one of my questions is whether, you know, to me the term official supervision is fairly broad and could it perhaps encompass an officer being posted outside of a closed door, for instance? I don't think so. I don't think that that was what was intended by the Pennsylvania Code provision there. Can you clarify on the viewing and deathbed visits, which are described in the policy as private, are those, in fact, conducted without supervision in the room? I don't know, but if I had to, well, I don't want to guess. No, I don't either. But perhaps the parties could submit supplemental briefing on that particular point and we'll put out a more specific order in terms of the details. And the other area I wanted to ask you about was on circumcision and the burden relative to other non-religious medical interventions that are permitted, specifically the elective termination of pregnancy. Appreciating that may be different at this point, Gustavs. But to the extent it has been historically provided and the medical procedures that go to gender-affirming care. So I think to focus the discussion when it comes to circumcision on the fact that it's in the elective surgery is very important, and your Honor should key in on that. The transgender issue I think is entirely inapplicable. That is the Department's, first of all, there's not much on the record at all about that, but that is the Department's accommodation under the Eighth Amendment medical deliberate and different standard for medically necessary types of procedures and surgeries. It's not at all in comparison to the standards under RLUIPA and comparably the First Amendment when it comes to someone's religious beliefs. Is the Department's position that even after RLUIPA that spiritual health is of less important interest than physical health? It's just not one that's directly comparable from the Department's perspective. I mean, the processes by which, well, first of all, medically necessary surgery is much more immediate, right? It's sometimes a life-or-death situation that the inmate needs to engage in. The religious health, spiritual health, whatever we want to call it, there's a process that an inmate applies for an accommodation. It's not considered an emergency process. It is something that's thoroughly vetted by the Department in the form of religious accommodation request and then a grievance review if the accommodation is denied. I don't want to say that the Department considers it any less important. It's just a different process. It's, of course, a different assessment and analysis that the court would do in analogizing the issue under Eighth Amendment versus the issue under religious rights of an inmate. The specific interests that have been put forward, I mean, if we think of them in connection with the elective pregnancy termination or the gender-affirming surgery seems to address the same concerns. I mean, circumcision is a fraction of the cost of something like gender-affirming surgery. And to the extent the concern is that there might be complications that follow, I mean, that's certainly true of the other surgeries that are allowed under prison policies. So how should we think of that other than that there's disparate treatment here of the surgery requested for religious purposes? I think it's important to note that at the lower court level, Mr. Nunez was unclear who was going to pay for the surgery, and the court kind of keyed in on that as well in questions to my colleague. The government, therefore, had to assume that he was asking to use government funds for an elective or cosmetic surgery that wasn't medically necessary. Department policy does not provide for an ability for the government to use funds for elective surgery. We're confronting RLUIPA. RLUIPA provides statutorily that to accommodate religious exercise, it contemplates that additional costs may need to be borne by the prison system. So why isn't it statutorily mandated here? So we didn't argue, if you noticed at the beginning when I started a little while ago, we didn't argue that Mr. Nunez wasn't substantially burdened on this circumcision problem. We conceded that he's saying it's a sincerely held religious belief, and that because the government's saying no, we're not going to pay for that and any ramifications that come from it, that he is substantially burdened. It's an outright no from the government's position. But the compelling government interest here presented below were that, you know, elective surgeries aren't considered medically necessary from the department's perspective, and, you know, there are all of these things that could go wrong with the circumcision surgery. And in that case, even if Mr. Nunez was providing for the $3,500 or whatever it would cost to do the initial circumcision, the government's on the hook for any complications that may arise from that. And again, we've got – there's not unlimited funds within the government at the Department of Corrections. You know, they've got to sort of pick and choose with thorough analysis what's medically necessary after doctors reviewed it in the case of transgender issues, after a whole board reviews, you know, the complex issues that go into that type of analysis. How does that apply to the elective termination of pregnancy? I'm not as familiar with that in the policy, Your Honor. I apologize, but I don't have more to provide the court on that. You know, I imagine the rationale is we can't force a woman to have – you know, to carry a pregnancy to full term. And so if she decides that she doesn't want to do that, that that's within her ability to do so. Unless my colleagues have other questions at this point, we appreciate your stamina and a long argument and your assistance to the court in addressing these questions. And we will have – hear from you, Mr. Laverghetta, with rebuttal. Thank you, Your Honor. Thank you. I want to thank the court for taking all this time today to discuss these issues. I truly do believe that they're important. And that importance is what I'd like to talk about on rebuttal, and I'll be mercifully short on this at least try. First, just on the procedures. I just want to make clear that when it comes to gender-affirming care and to abortions, nobody – we're not saying whatsoever that the state shouldn't allow those procedures. That's a legitimate decision for the state to make. All we are saying is that under the law, the Supreme Court's been very clear that if you allow those procedures, that you cannot then ban a religiously motivated procedure. And I think – I would object to the characterization of circumcision as a cosmetic procedure for millions of Americans, Jewish, Muslim. It's a religious mandate. It's not cosmetic. And the distinction between medically necessary or elective, et cetera, I would argue that doesn't matter. Those – if they can't get around the requirements of our LUPA through these categories, and do one category more valuable than another. And so without addressing, you know, kind of every argument made over time, I guess I would just say this, that I think what the argument here today by the state has shown and what the barren record has shown is that the state doesn't take the religious exercise of inmates seriously or their responsibilities under our LUPA. When Congress overturned the Turner Standard by passing our LUPA, it made a value judgment that religion and free exercise by inmates is something worth protecting. It's a value of the highest order. Over time, some courts got it right. Some courts didn't. But the Supreme Court recently, in cases like Mass, like Ramirez, like Holt, they reaffirmed, we mean what we said. Congress meant what it said. Religion is important. And you need to show an extraordinarily high compelling interest in order to burden that exercise. And you have to make sure that there's no way around it. So what we've been hearing, I think, from your colleague is that the Department of Corrections could make that showing on remand. And given that there's been transfers among different facilities where the facts on the ground are now different, that before moving forward to trial, it would only make sense to develop the record further as to the current circumstances. And this is as applied to him in particular, rather than just going to trial about these sort of restrictions in the abstract. So, again, I think that the court has been very clear. The statute is clear itself. The court has been very clear. But the state board, they diverted on these issues. They've had their attempt. And they didn't take it seriously. It's not that they just missed the mark. I mean, there are a lot of questions that neither side could answer today, very good questions, because the record is there. The state did nothing to put forward evidence on a compelling interest, did not address obvious alternatives which are required to do, and nothing is more obvious than what other states did. We could go on. We've talked about all of this. They did not take their burden seriously. What I would submit is that unless courts say to the lower courts and to the states, no, again, they meant what they said, you're stuck with this record. In this particular instance, in regards to this particular claimant, you failed. Going forward, that's the only way lower courts and states are going to actually take their obligations under ARLUPA seriously. Otherwise, we end up in a situation like we have here where a litigant has spent a decade trying to vindicate basic and pretty simple religious beliefs, including praying with other people, getting a circumcision, and consummating a marriage. Ms. Trevenger has pointed out correctly that these are policies that are longstanding on the books for many prisons. With something like the conjugal visits, there's only four instances that you've pointed this to. For communal prayer with visitors, there's no other jurisdiction to which you've pointed us. So if we were to discuss the kinds of additional findings that might be needed, additional evidence and categories of evidence that might be required, why wouldn't that be expounding on the standard in a way that would make it appropriate for the district court to address in the first instance on a record developed with that new standard in mind? I think, again, the state knew that it had the burden of putting forth this evidence and just didn't do so. Again, the impact of the decision in this case, and to quell some of the fears that are being expressed by Ms. Trevenger, there are not broad implications into finding for Mr. Nunez in this case. The implications are limited to Mr. Nunez getting a circumcision, which costs somewhere between $8,000 and $3,500, him getting to pray in a room that already exists and used for other means, and him getting to consummate his marriage where other states do this. This does not set a precedent. This does not require the state to change their policy generally. And I would just keep going back to the state had an obligation and opportunity in litigation to put forth that evidence. Repeatedly giving the state another bite of apple to post hoc justify denials that came several years ago seems inappropriate. And on the state issue, again, the DOC was aware that other states allowed this type of conduct. The conjugal visits, of course, we talked about. But they also cite in their own briefing the Vega case, the 2009-2013 District of Connecticut. They cited it to support the proposition that congregate prayer wasn't allowed, but actually in that particular circumstance the prisoner sought to engage in congregate prayer five times a day. Broadly speaking, Connecticut permitted congregate prayer. And so, again, it shows that the state was aware of that when they made the argument. And this is another burden shifting. Ms. Schrodinger said in her argument, well, we have to respond to what the inmates bring up. That's inappropriate, but it's particularly inappropriate with what other states do. This is a penal system. This is like an inmate cannot be expected to be a scholar on the laws of 50 states. What can be expected is that when a prison system denies a request from a religion observant, that they check what other states do. They didn't do that here. If they did, they chose not to address it. At the risk of your mercifully short rebuttal extending a little bit longer, let me just ask you, how does it really move the ball forward for us to say it goes back and goes straight to trial? Even in, and this is where we ended last time, wouldn't the district court be in a position to grant a directed verdict given evidence that could be put in as simple as a history of disciplinary infractions, for example? It may be. It may be that the district court, if the local reversed and there were instructions to go to trial, that there could be additional factual development allowed, and the litigation would play out, and I won't predict how it would go. But in other words, how does it move the ball? I think in terms of giving incentives to the states, to prison systems, to take their obligations seriously, moving to trial, they should move to trial at this point. There was an obligation. In general, parties do not get second bites of the apple when it comes to summary judgment. You get it right. Maybe you realize afterwards that you could have presented additional evidence, and now you're preparing for trial, and that's the way it goes. And I think that's the appropriate course here. All right. We thank both counsel for an excellent argument today and the time that you've taken with us this morning on this very important issue. We will take the case under advisement, and we will request that a transcript be prepared and include that in the order that we put out as well.